No. 82-395

IN THE SUPREME COURT OF THE STATE OF MONTANA

1983

---

DEE SHEPARD,

            Claimant and Appellant,

   vs.

MIDLAND FOODS, INCORPORATED,
Employer, and GLACIER GENERAL
ASSURANCE COMPANY,

            Defendants and Respondents.

---

Appeal from: Workers' Compensation Court
          Honorable Tim Reardon, Judge presiding

Counsel of Record:

    For Appellant:

        Hall, Halverson & Sheehy, Billings, Montana
        William T. Kelly, Billings, Montana

    For Respondents:

        Crowley, Haughey, Hanson, Toole & Dietrich, Billings, Montana

---

Submitted on briefs: April 21, 1983

Decided: July 19, 1983

Filed: JUL 19 1983

*Ethel M. Harrison*

Clerk

Mr. Justice Fred J. Weber delivered the Opinion of the Court.

Claimant Shepard appeals from a decision of the Workers' Compensation Court that he was ineligible for further benefits. We reverse the Workers' Compensation Court, and remand for a determination of compensation due, as well as fees, costs and penalties, if any.

Claimant presents half a dozen issues for review. The following issues are dispositive:

1. Whether there was substantial evidence to support the Workers' Compensation Court's determination that claimant's knees had deteriorated (and eventually collapsed) because of other than work related reasons.

2. Whether there was substantial evidence to support the Workers' Compensation Court's determination that claimant had recovered from his February 14, 1980 industrial accident by February 25, 1980, when he returned to work.

Dee Shepard, the claimant, has been a general laborer all his working life. In September of 1973, he was hired by Midland Foods, Inc. (Midland). His job involved very heavy work cleaning the boning room and beef coolers in a packing plant. For six and one-half years, claimant routinely lifted garbage cans and tubs containing meat scraps and bones which weighed several hundred pounds. He jacked up and hauled away racks of meat weighing half a ton to a ton. He washed the boning rooms and coolers, squatting, kneeling and stooping for hours at a time, while pulling heavy hoses and machinery. He lifted garbage cans full of ice. He jumped on and off a four-foot-high table he had to clean. Mr. Shepard is a stocky man, 5'4½" tall, whose weight has fluctuated between 155 and 205 lbs. over the last decade. His favorite hobby, up until he was 50 or 52 years old, was weightlifting.

At 50 years of age, he could lift 500 lbs. He stopped weightlifting about 1969.

In 1972, Mr. Shepard began having pain in his knees. His doctor diagnosed the condition as degenerative arthritis and chondrocalcinosis. Doctors testifying in this case described the first condition as a relentlessly progressive disease involving the wearing away of the cartilage lining of a joint, accompanied by pain, bony changes and some bone deformation. The condition generally takes years to develop into an advanced stage and is not reversible. It is aggravated, and the accompanying degeneration of joints and bones is accelerated, by weightbearing, obesity and trauma. The doctors described chondrocalcinosis as the existence of calcium crystal deposits in the joints. The deposits sometimes break free and cause episodes of severe pain and swelling known as "pseudogout." Pseudogout is treatable with anti-inflammatory drugs. Chondrocalcinosis and pseudogout do not cause instability or degenerative changes in the bone. They are neither caused nor aggravated by heavy lifting. In fact, pseudogout may flare up during periods of inactivity, as the record shows it did for Dee Shepard.

The physician attending Mr. Shepard in 1972 (Dr. Flynn) noted that an x-ray of the left knee showed changes in the cartilage and bone consistent with advanced degenerative arthritic change. He noted, "I cannot see any fracture or dislocation in the left knee." During the next eight years, claimant experienced several episodes of pain and swelling and some instability in his knees. Doctors treated him by draining synovial fluid and injecting cortisone into the knee. In 1975, when Mr. Shepard was hospitalized for a heart attack, "minimal varus deformity," or slight bowleggedness, was noted by a Dr. Hull in both of Mr. Shepard's knees. This

condition is also consistent with degenerative arthritis. From September of 1973 on, Mr. Shepard performed the extremely heavy work required by his job with Midland. By 1977, he was walking with a limp.

On February 14, 1980, Mr. Shepard slipped on an icy step at work and fell, twisting his left knee and striking it sharply against the edge of the step. His knee was numbed by the blow but gradually became very painful. Mr. Shepard completed his shift, then went to the St. Vincent's Hospital emergency room in Billings, where his knee was x-rayed and his leg put in a strap-on cast. Within a few days, claimant visited Dr. Taylor, who fitted him with a hinged leather lace-up brace and crutches. The brace was required to keep Mr. Shepard's left knee from "popping out," or dislocating. He wore the brace for approximately a year, and used the crutches for two months longer.

Mr. Shepard received temporary total disability benefits until he returned to his job on February 25, 1980, a period of ten days. He testified that working after February 25 was extremely painful for him, and that he began to experience difficulties with his right knee as well:

> "Q. Did you experience any problems as a result of wearing that hinged knee brace for approximately a year? A. Yes. I would have to lace it so tight in order to keep my left knee in place that I would cut off the circulation off of my leg and my leg would swell above the brace and also below the brace. And my toes would discolor, and three to four times a night I would have to open it up and massage my leg in order to get circulation back. The pain was terrible. . . If I slacked off a little bit on the brace, [the left knee] would not stay in place. I'd go to step down, and I would fall because there was nothing there.
>
> "Q. What problems were you having with the right knee during this period of time? A. I was bearing as much weight as I could bear to take the pressure off the left knee.
>
> "Q. What did you experience as a result of putting more weight on your right knee? A. Mostly it

4

would get so tired and then I would be getting pain.

"Q. In which leg or knee? A. On the right -- On the right knee."

On April 10, 1980, on the advice of Dr. Taylor, Dee Shepard retired. Dr. Taylor's case notes on Mr. Shepard, dated April 10, 1980, state, "His knees have collapsed." A subsequent letter from Dr. Taylor to claimant's attorney, dated June 15, 1981, states in pertinent part:

"I would say there was aggravation of a knee problem with the accident of Feb. 14, 1980 . . . His knee problem is presumed to be quite a long term, very chronic, kind of dysfunction, and I would consider the percent of aggravation . . . to be very small as regards the Feb. 14, 1980 incident."

Dr. Griffin examined Mr. Shepard in December of 1981. He noted that x-rays showed significant degenerative changes in Mr. Shepard's knees since 1972, and found "rather remarkable [varus] deformity." (bowleggedness) Dr. Griffin testifed that such a deformity "means almost always that there's been significant bony change in one of the compartments of the knee . . . [It] means that there's significant wear and tear." Dr. Griffin also stated that while Mr. Shepard's weightlifting hobby could explain the changes evident in 1972, it could not be considered the only possible cause, and that weightbearing, along with obesity and trauma would accelerate the degeneration of the cartilage and the joints.

Dr. Taylor, Mr. Shepard's attending physician after the February 14, 1980 accident, stated that he was "not very impressed with the specific incident as the main problem." He described Mr. Shephard's knees as "disaster knees," which, due to a longstanding condition of degenerative arthritis had deteriorated by 1980 to the point that they would respond to nothing but fusion, or the more preferable total knee

5

replacement. Dr. Taylor noted that the February 1980 x-rays indicated "multiple knee injuries [and] many, many subluxations" or small dislocations in both knees. He stated that, although the industrial accident was an aggravant, he did not consider it the major cause of damage to Mr. Shepard's joints, not the kind of thing which takes the arthritic person to his "crippling end." The weightbearing and activity associated with day-to-day living aggravated the condition. Dr. Taylor stated that Mr. Shepard's knee deterioration would have resulted in his forced retirement within a short period. He also stated:

> "The job that you described to me, that was described to me that Mr. Shepard did at Midland Pack, I am sure would be an accelerant."

Upon Mr. Shepard's retirement he sought, and was denied, permanent total disability benefits. He petitioned the Workers' Compensation Court for a hearing, which was held November 18, 1981. The Workers' Compensation Court issued its findings of fact, conclusions of law and judgment on September 14, 1982 denying benefits, costs, fees and penalties. Mr. Shepard appeals.

## I.

Mr. Shepard argues that both his work for Midland and the February 14, 1980 accident at work aggravated his underlying condition of degenerative arthritis, accelerating the approach of his eventual breakdown and total disability. He argues that the Workers' Compensation Court erred in its conclusion that the condition of his knees had deteriorated because of other than work-related reasons. We agree.

Uncontested evidence established that Mr. Shepard's degenerative arthritis was a pre-existing condition which had been diagnosed prior to his beginning work at Midland.

6

> "The well established rule in Montana is that an employer takes his employee subject to the employee's physical condition at the time of employment. _Schumacher v. Empire Steel Manufacturing Co. and Employers Mutual Liability Insurance Co._ (1977), Mont., 574 P.2d 987, 34 St.Rep. 1112. _Close v. St. Regis Paper Co._ (1977), Mont., 573 P.2d 163. The fact that an employee is suffering from or afflicted with pre-existing disease or disability does not preclude compensation if the disease or disability is aggravated or accelerated by an industrial accident. _Birnie v. U.S. Gypsum Co._ (1958), 134 Mont. 39, 328 P.2d 133; _Rumsey v. Cardinal Petroleum_ (1975), 166 Mont. 17, 530 P.2d 433." _Robins v. Anaconda Aluminum Company_ (1978), 175 Mont. 514, 518, 575 P.2d 67, 70.

This Court has recognized that a series of minor traumas, which are work related and which sufficiently aggravate a pre-existing condition to result in disability, must be treated as a slowly developing injury, which is compensable. _Jones v. St. Regis Paper Co._ (1982) _____ Mont. _____, 639 P.2d 1140, 38, St.Rep. 2201.

In _Hoehne v. Granite Lumber Co._ (1980) _____ Mont. _____, 615 P.2d 863, 37 St. Rep. 1307 (not a pre-existing injury case), we held that the "tangible happening of a traumatic nature" required under section 39-71-119(1), MCA, before injury can be found, need not be a single isolated incident, but may well be a "chain of incidents" leading to an injury. In _Hoehne_, the claimant's job involved stacking lumber on a daily basis; the work itself was found to be a series of actions or incidents resulting in injury. In _Hoehne_, this Court also recognized that "unusual strain" under section 39-71-119(1), MCA, does not necessarily refer to an unexpected cause, but can apply to an unexpected resulting injury, even though the effort involved was not unusual for the particular job. See _Jones v. Bair's Cafes_ (1968) 152 Mont. 13, 445 P.2d 923, wherein claimant, a dishwasher, was injured lifting a heavy tray of dishes, although such lifting was a routine part of her job. This

Court affirmed the Workers' Compensation Court, holding that there was an "unusual strain" and a compensable injury under section 92-418, R.C.M. 1947, the forerunner to section 39-71-119(1), MCA.

In the case at bar, both Dr. Griffin and Dr. Taylor testified by deposition that the heavy work Mr. Shepard routinely performed at Midland would have aggravated his existing condition, i.e., would have accelerated the breakdown of his knees. Both physicians recognized the February 14, 1980 accident as an aggravant of Mr. Shepard's condition. X-rays show "a marked increase" in varus bone deformity between 1972 and 1980, just after Mr. Shepard's accident. The x-rays also indicate "many, many subluxations", or small dislocations in the knee joints, which were not evident in 1972. The physicians stated that these symptoms were indicative of wear and tear on the joint, and would probably result in pain and instability. This evidence of work-related injury aggravating a pre-existing condition is considerable and is unrebutted.

The well-settled standard of review in cases appealed from the Worker's Compensation Court is stated in Nielsen v. Beaver Pond, Inc. (1983) _____ Mont. _____, 661 P.2d 47, 49, 40 St.Rep. 489, 491:

> "Our function in reviewing a decision of the Workers' Compensation Court is to determine whether there is substantial evidence to support the findings and conclusions of that court. We cannot substitute our judgment for that of the trial court as to the weight of evidence on questions of fact. Where there is substantial evidence to support the findings of the Workers' Compensation Court, this Court cannot overturn the decision. Steffes v. 93 Leasing Co., Inc. (U.S.F. & G.) (1978), 177 Mont. 83, 86, 87, 580 P.2d 450, 452; [Pinion v. H. C. Smith Const. Co. (1980) _____ Mont. _____, 619 P.2d 167, 168, 37 St.Rep. 1355, 1356-57]; Novak v. Montgomery Ward and Co. (1981), Mont., 638 P.2d 390, 392, 38 St.Rep. 1803; Viets v. Sweet Grass County (1978), 178 Mont. 337, 583 P.2d 1070, 1071, 1072."

Respondent relies on statements by Dr. Taylor and Dr. Griffin that Mr. Shepard's "main problem" was degenerative arthritis of the knees and pseudogout caused by chondrocalcinosis, which conditions had been present for nearly a decade and probably would have forced his early retirement even absent the 1980 accident.

The Workers' Compensation Court found that the 1980 accident aggravated Dee Shepard's pre-existing knee condition, and that "weight-bearing, at work or otherwise, would speed up the degenerative process." There is no evidence whatsoever to suggest that Mr. Shepard did heavy work outside of his job with Midland, having abandoned his weightlifting hobby at least three years before he began work with Midland and more than ten years before his fall in February of 1980. Certainly his own weight and the normal degeneration associated with the disease contributed to Mr. Shepard's breakdown in 1980. But unchallenged medical evidence establishes that the pre-existing condition was aggravated and the degeneration and breakdown were accelerated by the many small traumas to his knees caused by Mr. Shepard's work with Midland and also by his February 14, 1980 industrial accident.

We hold that the Workers' Compensation Court's conclusion that Dee Shepard's knees had deteriorated for other than work related reasons is not supported by substantial evidence.

II.

The Worker's Compensation Court found that when Dee Shepard returned to work on February 25, 1980, he "had completely recovered" from the aggravation of his condition caused by his fall. Respondent now urges this Court not to "retry Dee Shepard's case," because the unrebutted evidence

that he returned to work and worked steadily for approximately six weeks before retiring, constitutes substantial evidence that he had completely recovered.

We do not agree. That evidence only indicates that he was able to return to work for six weeks. The remainder of the evidence establishes that Dee Shepard returned to work in a condition far worse than before his accident and that he worked for six weeks despite pain, inconvenience and further deterioration of his condition caused by the heavy work and his attempts to minimize the pain and damage to his left knee by shifting his weight to the right.

Before his accident, Dee Shepard had worked steadily for years, without a brace, without crutches, and without constant, severe pain. He returned to work only ten days after his accident with a hinged leather brace, which had to be kept extremely tight to prevent his knee from dislocating constantly. He was in such pain that he took up to a dozen aspirin during a shift, a fact noted by the Workers' Compensation Court. His right knee began to trouble him because of the extent to which he favored the left. In April of 1980, Dr. Taylor noted: "His knees have collapsed." Dr. Taylor stated in deposition that there is no "healing process" with degenerative arthritis, only an "attempt at healing" which results in the type of extra bone formation evident in Mr. Shepard's x-rays. The disease itself is "relentlessly progressive", although the speed of deterioration can be affected by weightbearing, obesity and trauma.

Dr. Griffin, who treated several of Mr. Shepard's episodes of pseudogout between 1972 and 1976, did not see Mr. Shepard again until December of 1981, nearly two years after Mr. Shepard's return to work. His conclusion that in

10

December of 1981, Mr. Shepard's pseudogout symptoms were, "fairly well resolved," can have no bearing here, being too remote in time to indicate Mr. Shepard's condition upon his return to work in February of 1980.

Mr. Shepard stated at hearing in November of 1981 that he was at that time exercising and moving without pain. Dr. Taylor attributed that not to recovery, but to "neuropathic knees", a loss of feeling in the knees, generally due to some other condition, which usually results in further knee damage due to use of a damaged knee joint without the protection of the warning provided by pain.

There is no substantial evidence which supports the Workers' Compensation Courts' conclusion that Dee Shepard had fully recovered from his accident at the time he returned to work. On the contrary, all significant evidence suggests the return to work of a man disabled by disease, weightbearing at work, and work-related trauma, whose disability was increased by his return to work.

We reverse the Workers' Compensation Court on both issues and remand this case for a determination of the compensation, costs, fees and penalties, if any, to which Dee Shepard is entitled.

_____
Justice

We concur:

_____

_____

_____
Justices

Mr. Justice L. C. Gulbrandson dissenting.

I respectfully dissent.

I would affirm the decision of the Workers' Compensation Court on the basis that there is substantial evidence to support the findings and conclusion of that court.

Judge Reardon, after observing and hearing the testimony of the claimant and considering the depositions of the two medical experts, ruled that the claimant's incapacities were not produced by the industrial accident of February 14, 1980. In referring to the claimant's medical condition and the specific incident of the knee injury on February 14, 1980, Dr. Taylor testified as follows:

"Q. During the course of Mr. Kelly's examination earlier, you were referred to your first report of treatment of Mr. Shepard, and you said that your diagnosis was 'knee arthritis', indicating that you were not particularly impressed with the single incident. Can you describe why?
A. I was . . . You are in fact correct. I was not impressed with the single incident, as it was quite clear from clinical findings and x-ray findings that Mr. Shepard had had, in my opinion, a high likelihood of having had badly disorganized knees for some time. In fact, I did not even refer in my initial note and incorrectly so to the fact that he had been recently injured.

"Q. You have indicated to Mr. Shepard and also to Midland Foods that he should probably retire because of the condition of his knees.
A. That, and another reason.

"Q. What is the other reason?
A. That is something that I have to take exception to Mr. Kelly's list of fact. I really question as readily as the quitting work of how badly he wants to keep working. He fits "the last-straw syndrome". That is an elderly man who is working in a relatively, an uneducated elderly man who is working in a fairly uninteresting job who sustains an injury, and that injury can be relatively minor. It is really difficult for that patient to return to work, and for that reason in making that diagnosis of "the last-straw syndrome", I recommended that he be retired as I felt certain that he would never return to work, in any case.

"Q. Referring then to the first reason, the instability and the long-standing problems with both knees, would that reason alone have been sufficient for you to make that recommen-

- 12 -

dation that he retire?
A. Yes.

"Q. Is the left knee, based upon your clinical findings and your x-rays and all of your experience in the same, better or worse condition than the right knee?
A. Well, both are in terrible condition, but I would say that the left knee has some retention of joint space medially, and on a scale of one hundred bad points the right knee has one hundred and the left has ninety-nine.

"Q. So actually the left knee is better than the right knee based on what?
A. Very marginally.

"Q. That's all?
A. And recall, too, that historically he has pain in his, he has alleged pain in his left knee and that obviously makes it a worse knee.

"Q. You indicated also in answer to a question by Mr. Kelly that the ordinary functions of life are going to continue to aggravate the condition of Mr. Shepard's knees?
A. Yes. This is a relentlously progressive condition.

". . .

"Q. You said that it is a relentlously progressive condition, and that there are aggravations similar to the one which you presumed occurred on February the 14th, 1980, the industrial accident. And I am asking you to describe what the effect of those aggravations is, or what their nature is.
A. That was a specific aggravant, an injury. And these, while they are probably aggravants, are not the kind of things which takes this man to his eventual end, and I think that end must be a crippling end. They are, the things that bring him to that end are the fact that he continues to bear weight; in other words, he gets out of bed in the morning, goes to the bathroom, has breakfast, goes out and works in his yard or goes for a walk or goes fishing or gets in the car and goes down to the grocery store, all of these things involve weight bearing and will mandate relentlous progression.

". . .

"Q. Doctor, we take the view that if Mr. Shepard is disabled due to a physical condition at this time, that that disability is one which exists with or without the occurrence of this February 14th, 1980 incident. Do you agree?

". . .

"A. Okay, within a reasonable degree of medical certainty, yes.

"Q. You agree with me?
A. Yes. Agree that he would have been, would

have retirement within a short period, in any case, as much because of his knees as the other factor that I mentioned. In addition to which, he approaches the normal age for retirement, in any case."

Dr. Griffin testified by deposition and hospital records from the Billings Clinic were received in evidence. Those records revealed severe knee problems as early as August, 1972. The radiology report, made in conjunction with claimant's complaints at that time, stated: "These findings are consistent with advanced degenerative arthritic change." Dr. Griffin testified as follows:

"[Q.] I'm asking did you see any symptoms of this February 1980 slip and fall on your physical examination of Mr. Shepard?
A. Well, the only thing I saw was--evidence of his physical findings was noted; namely, some arthritic changes in both knees.

"Q. And these are things that you had seen going back as far as 1972, correct?
A. Correct.

"Q. Including, I think, a reference to the limp as far back as 1977, at least?
A. Right.

". . .

"Q. Well, Doctor, in a nutshell, I guess I'm asking whether or not it would be your medical opinion that Mr. Shepard's impairment with regard to his knees was medically the result of the degenerative arthritis, pseudogout, and chondrocalcinosis, which is of longstanding.

"MR. KELLY: Excuse me. Objected to on the grounds that the question is not phrased in the terms of being within a reasonable degree of medical certainty and is irrelevant and immaterial.

"BY MR. BISHOP:

"Q. And, of course, I'm asking for your opinion within a reasonable degree of medical certainty.
A. Well, the answer to your question is yes.

". . .

"Q. Doctor, we have previously taken the deposition of Dr. James Taylor, an orthopedic surgeon here in Billings who you have referred to also, I see, in your note of December 29, 1981, and Dr. Taylor has testified that he's not impressed with the single incident of February 1980 as an explanation for the condition of Mr. Shepard's knees, which Mr. Shepard describes as incapacitating, and I

will ask you for your opinion, to a reasonable degree of medical certainty, as to the effect, if any, which you would assign to the February 1980 event which Mr. Shepard has described to you insofar as it relates to the condition of his knees which you have seen from 1972 through December 29, 1981.

"MR. KELLY: Excuse me, Doctor, before you answer. I wish to object upon the grounds that the question exceeds the scope of the cross examination and is improper, irrelevant, immaterial, and incompetent, and does not assume all of the facts, and is an improper hypothetical question.

"MR. BISHOP: In view of the fact that cross examination centered on the question of the claimant's incapacity and the measuring of that incapacity, I think that this redirect is perfectly within the scope of cross.

"MR. KELLY: I move to strike Counsel's auditory explanation as not constituting a question.

"BY MR. BISHOP:

"Q. Do you have the question in mind still, Doctor?
A. Well, yeah, I think I know what the question is.

"Q. Okay. Why don't you go ahead and try to answer it, then.
A. Well based on my notes and records, I would say that Mr. Shepard's incapacity related to his arthritis is one of longstanding, and I, since I did not see him at the time of his injury but I did see him in December of 1981, and I would say that his changes were those of chronic degenerative arthritis of the knees, a chronic process.

"Q. What effect or significance, if any, would you assign to the February 1980 slip and fall incident which Mr. Shepard describes?
A. From what it sounded like to me, he had a contusion of his knee with a lot of immediate pain and swelling and discomfort.

"Q. From what you saw, did it appear that that had, then, run its course?
A. It appeared to be fairly much resolved when I saw him."

The Workers' Compensation Court's decision hinges upon the fundamental principle that compensation is payable only for "injury producing . . . disability." See sections 39-71-701, 702, and 703, MCA.

In my view, workers' compensation insurance does have statutory limits. Its benefits should be liberally allowed, but it

should not be construed so broadly that it becomes a substitute for general health insurance, pensions, or retirement programs.

This Court recently handed down a decision tacitly approving the State's commendable program of hiring the handicapped. I fear that the majority decision will provide great incentive to employers to avoid hiring anyone who is in less than perfect health.

I would affirm the Workers' Compensation Court Judge.

_____
Justice