No. 95-015

IN THE SUPREME COURT OF THE STATE OF MONTANA

1996

BRUCE MARCOTT,

      Petitioner and Appellant,

   v.

LOUISIANA PACIFIC CORPORATION,

      Employer and Defendant/Respondent.

**FILED**

FEB 14 1996

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:    Workers' Compensation Court, State of Montana,
                The Honorable Mike McCarter, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

          Chris J. Ragar; Ragar Law Office, Bozeman, Montana

      For Respondent:

          Kelly M. Wills; Garlington, Lohn & Robinson,
          Missoula, Montana

Submitted on Briefs:  August 24, 1995

Decided:  February 14, 1996

Filed:

_____
             Clerk

Justice Karla M. Gray delivered the Opinion of the Court.

Bruce Marcott appeals from the portion of the judgment entered by the Workers' Compensation Court which denied his request for the statutory penalty and attorney fees. We affirm.

We address the following issues on appeal:

1. Does substantial evidence support the Workers' Compensation Court's finding that Louisiana Pacific Corporation's denial of Marcott's claim was reasonable?

2. Did the Workers' Compensation Court err as a matter of law in refusing to apply "the Holton rule"?

### FACTUAL AND PROCEDURAL BACKGROUND

Bruce Marcott worked for Louisiana Pacific Corporation (LP) as head mechanic at its Belgrade, Montana, plant. LP is self-insured under Plan No. 1 of the Montana Workers' Compensation Act (the Act).

On February 17, 1994, Marcott and another mechanic, Gene Quillen, were performing repairs on a disabled LP forklift. The job required them to use a second forklift to lift the cab off of the disabled one. Using the operative forklift, Marcott lifted the cab, then dismounted. After dismounting, Marcott was walking behind the forklift when he heard a loud snap and felt pain in his left calf.

Quillen transported Marcott to the LP plant office. When Quillen asked what had happened, Marcott responded that his leg had "gone out." Matt Harris, Marcott's supervisor, asked what had happened and whether Marcott had tripped, slipped, or been running.

2

Marcott answered that he was "coming around the back [of the forklift] when it went out on me." In responding to questions by other supervisory personnel and Dr. Robert Jackson, the attending physician at the Gallatin Valley Family Clinic, Marcott indicated that he was just walking at the time of the injury. During his transport to the clinic and his subsequent examination by nine different doctors, Marcott did not inform anyone that he was doing anything other than walking. At the clinic, Dr. Jackson diagnosed Marcott's injury as a torn muscle in his left calf.

LP personnel and safety director John Mikkelson, whose duties include advising LP whether workers' compensation claims are compensable, examined information provided by supervisory personnel and medical records provided by Marcott's physicians. Mikkelson also obtained legal advice regarding the compensability of an injury sustained while walking at work. After evaluating the information, Mikkelson notified Marcott by letter dated March 21, 1994, that LP was denying his claim. The letter also informed Marcott that LP would reevaluate his claim if he provided any additional information.

LP first learned of Marcott's assertion that he was walking briskly and turning sharply at the time of his injury in a letter from Marcott's counsel dated April 29, 1994. In light of this information, LP personnel reviewed Marcott's medical records, including information provided by another physician, Dr. David King. Dr. King indicated that Marcott's injury was not caused by any unusual demands placed on Marcott by his employment. Mikkelson

3

considered Dr. King's information to be consistent with his legal understanding that the injury was not compensable. LP continued to deny liability for Marcott's claim.

Marcott petitioned the Workers' Compensation Court for a determination that his injury was compensable under the Act and that he was entitled to temporary total disability benefits. He also contended that LP was unreasonable in refusing to accept liability for his injury and sought the statutory penalty and attorney fees. LP responded, contending that factual and legal disputes regarding the compensability of Marcott's injury required resolution by the court and that it had not unreasonably denied Marcott's claim.

At trial, Marcott testified that his injury occurred while he was walking "pretty fast," turning on his left leg and just coming down on his right foot. He admitted that he told his supervisors and attending physicians only that he was walking, but attributed the lack of further detail to the significant pain he was experiencing and the absence of follow-up questions by both LP and the physicians. Marcott also provided substantial medical evidence in support of his testimony regarding how the injury occurred. Dr. John Campbell, Marcott's orthopedic surgeon, opined that it was more probable than not that an unusual strain caused Marcott's injury. Dr. King, a family practitioner, testified that merely walking across a floor would not provide an adequate explanation for Marcott's injury.

LP relied on Marcott's original statements to LP personnel and

4

his physicians regarding how the injury occurred and on June 1994, correspondence from Dr. King describing walking briskly and turning sharply as relatively benign activities. Dr. King also opined in the letter that, while Marcott's injury occurred at work, it was "not specifically caused by any unusual demands placed on him by his employment."

LP also relied on the testimony of Dr. Donald Harrell, an orthopedic surgeon it retained after denying Marcott's claim and receiving Marcott's "walking briskly and turning sharply" information. Dr. Harrell opined on direct examination that walking briskly while turning sharply places no unusual increase in stress on the calf structure. In Dr. Harrell's view, the fact that the injury occurred at work was coincidental, because Marcott's work activities placed him at no greater risk of injury than that faced by any individual of his age in normal daily life. On cross-examination, however, Dr. Harrell agreed that some unusual force generally is required to cause a muscular rupture and, therefore, that Marcott's injury was an unusual result given his activity at the time of the injury.

The Workers' Compensation Court concluded that Marcott's injury was compensable. It also concluded, however, that Marcott was not entitled to the statutory penalty or attorney fees. Marcott appeals.

## DISCUSSION

In addition to substantive workers' compensation benefits, the Act authorizes a 20% increase in the full amount of benefits, and

5

an award of attorney fees, when an insurer denies liability for a claim later adjudged compensable and the Workers' Compensation Court determines that the insurer's denial was unreasonable. Sections 39-71-2907 and 39-71-611, MCA. The penalty set forth in § 39-71-2907, MCA, was not intended to eliminate an insurer's assertion of a legitimate defense to liability. Paulson v. Bozeman Deaconess Foundation Hosp. (1984), 207 Mont. 440, 444, 673 P.2d 1281, 1283 (citation omitted).

In this case, the Workers' Compensation Court concluded that Marcott's injury was compensable based on its determination that Marcott was walking rapidly and turning sharply when the injury occurred; thus, according to the court, the injury was caused by an unusual strain under § 39-71-119(2)(a), MCA. This conclusion satisfies the threshold factor for an award of both the penalty and attorney fees against LP--denial of liability for a claim later adjudged compensable. The court found, however, that LP's denial of Marcott's claim was reasonable and, on that basis, declined to award Marcott the statutory penalty or attorney fees.

Marcott challenges the court's "reasonableness" finding and each of the several bases on which the court relied for its finding. Reasonableness is a question of fact. Stordalen v. Ricci's Food Farm (1993), 261 Mont. 256, 258, 862 P.2d 393, 394. We review the Workers' Compensation Court's findings of fact to determine whether they are supported by substantial evidence. Stordalen, 862 P.2d at 394.

It is important to note at the outset that neither the

6

compensability of Marcott's claim nor the correctness, as a matter of law, of LP's legal interpretation regarding compensability is at issue here. The Workers' Compensation Court found Marcott to be a credible witness and resolved a factual dispute over whether the injury occurred while he was merely walking or walking briskly and turning sharply in his favor. On that basis, the court determined that Marcott's injury was caused by an unusual strain as contemplated by § 39-71-119(2), MCA, and, therefore, that the injury was compensable.

Only the Workers' Compensation Court's finding that LP's denial of Marcott's claim was reasonable is before us on appeal. We will address in turn each reason the court articulated for its reasonableness finding. Before doing so, however, we summarize LP's overall position because of its importance in understanding our analysis of whether substantial evidence supports the Workers' Compensation Court's "reasonableness" finding.

Briefly stated, LP asserted that a factual dispute existed over whether Marcott was merely walking or walking quickly and turning sharply at the time of the injury and that the factual dispute, which arose more than two months after the injury, involved Marcott's credibility. LP also contended that, if Marcott were merely walking at the time, his injury was not compensable because it did not arise out of Marcott's employment as required by § 39-71-407, MCA.

1. Does substantial evidence support the Workers' Compensation Court's finding that LP's denial of

7

Marcott's claim was reasonable?

a. Factual dispute

The Workers' Compensation Court determined that LP reasonably relied on the information in its possession when it initially denied Marcott's claim, and that LP's continued denial was reasonable because, by that time, a "legitimate factual dispute existed as to whether claimant was simply walking or walking rapidly and turning sharply to his left." The factual dispute related to Marcott's credibility.

The record establishes that, following Marcott's injury, the only information in LP's possession which related to the circumstances surrounding the injury was that Marcott was just walking when his calf muscle ruptured. Several supervisory personnel interviewed Marcott and Quillen at different times regarding the incident and the reported facts remained unchanged; LP also obtained Marcott's medical records, which reinforced those facts. LP relied on this information in its initial denial of Marcott's claim. Thus, we conclude that substantial credible evidence supports the Workers' Compensation Court's finding that LP's reliance on this information at the time of the initial denial was reasonable.

The record also reflects that, more than one month after LP's denial of the claim, LP received a letter from Marcott's counsel. This letter asserted that Marcott was walking rapidly and turning sharply at the time of his injury; the letter was the first notice LP received that Marcott alleged anything other than that he was

8

simply walking at the time of the injury. As noted above, LP's legal interpretation hinged in large part on LP's original understanding of the facts surrounding the injury; namely, that Marcott was merely walking. According to the record, LP's receipt of the letter from Marcott's counsel containing a different version of the facts regarding the injury resulted in LP's continued denial of Marcott's claim on two bases: that a factual dispute regarding the circumstances surrounding the injury existed which required resolution by the Workers' Compensation Court; and that the factual dispute involved Marcott's credibility, a related issue requiring resolution by the court.

Based on this record, we conclude that substantial evidence supports the Workers' Compensation Court's finding that LP's denial of the claim based on the existence of a legitimate factual dispute was reasonable.

b. Legal interpretation

LP's position was that a muscle rupture which occurred while a worker was merely walking at work did not arise out of his employment under § 39-71-407, MCA. The Workers' Compensation Court determined that LP's reliance on heart attack and other cases to defend against the compensability of a condition which arises spontaneously as a result of an ordinary activity people do on a daily basis irrespective of work raised a colorable issue within the bounds of legitimate legal advocacy. In essence, this determination constituted a finding by the court that LP's legal interpretation, based on the facts as originally reported, was not

9

unreasonable.

In Hunter v. Gibson Products of Billings (1986), 224 Mont. 481, 485, 730 P.2d 1139, 1142, we clarified that, with regard to an insurer's decision to contest compensability based on its interpretation of case law, the Workers' Compensation Court's reasonableness finding remains a question of fact subject to the substantial evidence standard of review. This clarification was consistent with our 1984 holding in Paulson that the statutory penalty contained in § 39-71-2907, MCA, was never intended to eliminate the assertion of a legitimate defense to liability. Paulson, 673 P.2d at 1283. It also was consistent with our conclusion in Holton v. F.H. Stoltze Land & Lumber Co. (1981), 195 Mont. 263, 269, 637 P.2d 10, 14, that the existence of a genuine doubt, from a legal standpoint, that any liability exists constitutes a legitimate excuse for denial of a claim or delay in making payments.

Thus, as a general rule, where a court of competent jurisdiction has clearly decided an issue regarding compensability in advance of an insurer's decision to contest compensability, the clear applicability of the earlier decision constitutes substantial evidence supporting a finding by the Workers' Compensation Court that the contest over compensability is unreasonable. See Hunter, 730 P.2d at 1142. Conversely, where the issue upon which an insurer bases its legal interpretation has not been clearly decided, the lack of clear decision may constitute substantial evidence supporting a finding by the Workers' Compensation Court

10

that the insurer's legal interpretation is not unreasonable. Therefore, we determine here only whether the compensability of an injury sustained while a claimant is merely walking at work has been clearly decided.

Among this Court's cases upon which LP relied in contesting liability and compensability were Ness v. Diamond Asphalt Co., Inc. (1964), 143 Mont. 560, 393 P.2d 43; Dumont v. Wickens Bros. Construction Co. (1979), 183 Mont. 190, 598 P.2d 1099; and Wise v. Perkins (1983), 202 Mont. 157, 656 P.2d 816. We address each case in turn.

In Ness, the decedent worked as a general maintenance man and laborer and died as the result of a myocardial infarction which occurred at his workplace. Ness, 393 P.2d at 44. The issue before us was whether the evidence supported the district court's finding that the decedent's myocardial infarction was not in any way caused or influenced by the demands of his employment. The record established that the decedent had no history of heart disease and that he had not visibly exerted himself during the course of his employment on the day he died. Ness, 393 P.2d at 44. The record also contained a physician's opinion that there was no relationship between the decedent's employment and the cause of his death, as well as the statement that the episode "occurred while at work, rather than as a result of work." Ness, 393 P.2d at 45. We determined that the record supported the court's finding and affirmed the judgment of the court and the Industrial Accident Board that the decedent's widow was not entitled to workers'

11

compensation death benefits. Ness, 393 P.2d at 45.

In Dumont, we addressed the 1967 amendment to the statutory definition of injury--which required that the injury be a tangible happening of a traumatic nature "from an unexpected cause, or unusual strain"--and applied it to a case involving an employee who died as the result of a heart attack occurring at his job site. Dumont, 598 P.2d at 1106-09. The decedent had a history of arteriosclerosis, but his widow attempted to demonstrate that the death was compensable because the decedent was subjected to unusual strain by his employment. Dumont, 598 P.2d at 1101. The widow's medical witness ruled out any possible causal connection between the death and work-related events on or preceding the date of decedent's death. Dumont, 598 P.2d at 1108. We determined that the record failed "to disclose anything unusual that occurred to the deceased" in relation to his work. Dumont, 598 P.2d at 1108. Based on the absence of any work-related unusual strain or unexpected cause resulting in the decedent's heart attack, we affirmed the Workers' Compensation Court's judgment denying workers' compensation death benefits. Dumont, 598 P.2d at 1109.

LP analogizes Ness and Dumont to the present case by pointing out that here, as in those cases, the episode occurred at work but, at least according to the facts Marcott first reported, was not caused by and did not result from the work. It observes that, in those cases, we required that the "unexpected cause/unusual strain" element be met and, in addition, that we implicitly recognized the validity of its argument that the injury must be work-related; that

12

is, that the injury must "arise out of" the work. In this regard, LP also observes that it was entitled to rely on Dr. Harrell's pretrial and direct examination medical opinions that Marcott's work activities at the time of the injury did not increase his risk of injury and that walking briskly while turning sharply did not place an unusual increase in stress on the calf structure.

In deciding to contest liability in this case based on its interpretation that Marcott's injury was not compensable, LP also relied on the inapplicability of our decision in Wise. In Wise, the claimant usually worked as a custodian and bartender, putting in work days of around eight to twelve and one-half hours each. Over the period of a week during which all responsibility for operation of the bar unexpectedly fell on her, she worked approximately fourteen to eighteen hours per day, standing most of the time. On one or more occasions, the claimant was unable to sit at all during such a day and, indeed, she seldom had the opportunity to be off her feet at all during the week. Wise, 656 P.2d at 817. By the end of the week, she was experiencing swelling and pain in her legs and feet; her condition ultimately was diagnosed as thrombophlebitis of both legs and she sought workers' compensation benefits. Wise, 656 P.2d at 817.

The employer in Wise argued, among other things, that the claimant's phlebitis was not an injury under § 39-71-119(1), MCA, which, at that time, defined injury as a "tangible happening of a traumatic nature from an unexpected cause or unusual strain" which results in physical harm. Wise, 656 P.2d at 819-20. The Workers'

13

Compensation Court determined that the work week at issue constituted a tangible happening of a traumatic nature from an unusual strain. Based on the evidence establishing the claimant's excessive work schedule during that time, we agreed and affirmed the court's award of compensation benefits. Wise, 656 P.2d at 820.

LP points out that the compensability determination in Wise was premised on evidence of the claimant's excessive work hours on her feet and was not based on a determination that merely walking or standing at work was sufficient to constitute a work-related tangible happening from an unusual strain. Thus, according to LP, the issue of whether an injury sustained while merely walking at work is compensable has not been decided by this Court and, at least by implication from Wise, arguably could be decided in its favor.

Read as a whole and on a stand-alone basis, these cases appear to constitute sufficient evidence to support the Workers' Compensation Court's finding that LP's legal interpretation was not unreasonable in light of the facts as originally reported. Marcott addresses the cases on which LP relies only briefly, and this summary approach is not altogether inappropriate. As discussed above, the issue before us is not whether those cases compel a legal conclusion that Marcott's injury is not compensable. The issue is whether those cases provided LP with a reasonable basis upon which to contest liability; stated differently, the issue is whether LP's liability for an injury sustained while an employee was walking at work has been so clearly decided as to negate any

14

genuine doubt from a legal standpoint and render unreasonable the defense LP asserted to liability. See Hunter, 730 P.2d at 1142; Paulson, 673 P.2d at 1283; Holton, 637 P.2d at 14.

In this regard, Marcott primarily relies on Robins v. Ogle (1971), 157 Mont. 328, 485 P.2d 692, and Shepard v. Midland Foods, Inc. (1983), 205 Mont. 146, 666 P.2d 758, under which he claims his ruptured calf muscle is absolutely compensable as an unexpected effect meeting the "unusual strain" requirement of § 39-71-119(2)(a), MCA. On this basis, he contends that the Workers' Compensation Court's finding that LP's legal interpretation was reasonable is not supported by substantial evidence.

In Robins, we addressed whether a herniated disc sustained by the claimant when lifting a pail of water at work met the 1967 definition of injury under the Act; more precisely, the issue was whether the claimant's condition occurred as the result of an "unusual strain" pursuant to § 92-418, R.C.M. (1947). "Injury" was defined at that time as a tangible happening of a traumatic nature from an unexpected cause, or unusual strain. Robins, 485 P.2d at 693.

The claimant in Robins had been mopping the floor at the time her disc herniated, and we observed that the strain she suffered was not unusual from the perspective of the manner in which the mopping was being done. Robins, 485 P.2d at 694. The record reflected, however, that she had "picked [the bucket] up wrong" and "twisted [her] back" while moving the bucket and removing the mop. Robins, 485 P.2d at 694. Noting that a herniated disc resulting

15

from picking up a bucket in the wrong manner and turning to pick up the mop constituted a strain which was unusual from the standpoint of effect, we stated that "[a]n unusual result from a work-related strain qualifies as 'an unusual strain' under section 92-418, R.C.M. 1947." Robins, 485 P.2d at 695.

In Shepard, we addressed whether an aggravation of a pre-existing condition resulting primarily from a claimant's routine heavy work could result in a compensable injury under the same statutory definition interpreted in Robins. The claimant had performed extremely heavy work for his employer over a period of many years; he slipped and fell in 1980, twisting his left knee and striking it sharply on the edge of a step, and subsequently favored his right knee in order to take the pressure off his injured left knee. Shepard, 666 P.2d at 760. According to the medical evidence, the claimant's routine heavy work aggravated his underlying degenerative knee condition, even absent the 1980 fall and its aftermath. Shepard, 666 P.2d at 760.

We noted that a series of minor work-related traumas which sufficiently aggravate a pre-existing condition to result in disability could lead to an injury compensable under the Act, and reiterated our conclusion from earlier cases that "unusual strain" can apply to an unexpected resulting injury even though the effort involved was not unusual for the particular job. Shepard, 666 P.2d at 761 (citations omitted). On the basis of undisputed and substantial evidence of work-related injury aggravating a pre-existing condition, and the absence of any evidence that the

16

claimant did heavy work outside of his employment, we concluded that the Workers' Compensation Court's determination that the claimant's knees had deteriorated for other than work-related reasons was not supported by substantial evidence. Shepard, 666 P.2d at 762-63.

We observe that Robins and Shepard were decided in 1971 and 1983, respectively. Dumont and Wise, upon which LP relied for its legal interpretation, were decided in 1979 and 1983, respectively. None of the cases discusses, much less distinguishes or overrules, any of the others.

We agree with Marcott that Robins clearly states the law regarding "unusual strain" as that term is used in the Act. Robins did not, however, address a specific question regarding the work-related nature of the activity at issue or, as raised in this case, whether the injury "arose out of" Marcott's employment under § 39-71-407, MCA.

In the heart attack cases relied on by LP, on the other hand, we concluded that the conditions underlying the workers' compensation claims were not caused by work-related activity and were not compensable. Thus, those cases are distinguishable from Robins with regard to the specific legal interpretation and issue advanced here by LP.

On that basis, we conclude that the compensability of Marcott's injury had not been so clearly decided as to negate any genuine doubt from a legal standpoint. We hold that substantial evidence supports the Workers' Compensation Court's finding that

17

LP's legal interpretation regarding the compensability of Marcott's injury was not unreasonable.

c.   Investigation

Marcott's final assertion of error with regard to the Workers' Compensation Court's reasonableness finding relates to LP's investigation of Marcott's claim.  In its oral decision at the end of the hearing, the court rejected Marcott's contentions that LP's investigation was so inadequate as to be unreasonable.  The court found that LP reasonably relied on the information it received both from Marcott and from his medical records in deciding to deny Marcott's claim.

It is undisputed that insurers have an affirmative duty to investigate workers' compensation claims.

> [A]n insurer has a duty to make at least a minimal investigation of a claim's validity in light of the relevant statutes.  Absent such [an] investigation, denial of a claim for benefits is unreasonable.

Stevens v. State Comp. Mut. Ins. Fund (1994), 268 Mont. 460, 467, 886 P.2d 962, 966, overruled on other grounds by Kloepfer v. Lumbermens Mut. Cas. Co. (Mont. 1995), 899 P.2d 1081, 52 St.Rep. 663 (quoting Lovell v. State Comp. Mut. Ins. Fund (1993), 260 Mont. 279, 288, 860 P.2d 95, 101).

Here, the record reflects that LP interviewed Marcott and Quillen, the only witness to the incident; both stated that Marcott was just walking when the injury occurred.  LP also obtained Marcott's medical reports, which contained Marcott's statements to his doctors to the same effect.  These reports included, for example, Dr. Jackson's statement that "[p]atient was walking across

18

a level floor and felt an immediate sharp pain . . . he was not aware of striking any objects or any mishaps." Similarly, Dr. Campbell reported that Marcott was a ". . . male . . . while at work, taking a step and feeling something pop in the back of his left calf . . . ." Finally, LP sought legal advice on the compensability and liability issues vis-a-vis these reported facts. Based on this evidence and evaluation of the claim, LP denied liability.

Marcott argues that LP's investigation was inadequate. He contends, among other things, that LP could not reasonably rely on Marcott's initial statements because Marcott was in agonizing pain at the time they were made; that LP was required to ask Marcott and Quillen whether Marcott was walking rapidly or turning to his left when his calf muscle ruptured; and that, faced with a purported inconsistency in Dr. Jackson's report between Marcott's related history regarding the injury and the doctor's affirmative response to a question on the form report inquiring whether the patient's condition is "due to a work-related accident," LP had an obligation to contact Dr. Jackson to ascertain whether any additional or different history had been received from Marcott and why the form report indicated that the condition was due to a work-related accident. Marcott relies on Stevens in support of his argument that LP's investigation was inadequate and unreasonable.

In Stevens, the State Fund accepted liability for the claimant's accident and began paying benefits. Thereafter, it received an anonymous tip that the claimant was working; the tip

19

and subsequent statements regarding the invalidity of the workers' compensation claim originated with the claimant's former spouse. Stevens, 886 P.2d at 963-64. The State Fund arranged for two separate investigations and received reports from both investigators. Thereafter, the State Fund terminated the claimant's benefits based solely on its knowledge that a witness was available to testify against the claimant's version of the injury. It did not read the investigative reports it had commissioned, evaluate the "accuser's" statements, even though she was known to be the claimant's former spouse, or attempt to validate the accusations through interviews with either the claimant or other witnesses; nor did the State Fund opt to petition the Workers' Compensation Court to terminate benefits. Stevens, 886 P.2d at 966-67.

Under these circumstances, we concluded that the State Fund had failed to make "a reasoned review of all available evidence in the case . . . followed by an impartial evaluation of the evidence reviewed." Stevens, 886 P.2d at 968. We also concluded that this failure to make even a minimal review and evaluation after the investigations were completed--and prior to terminating benefits--rose to the level of unreasonable conduct; thus, we held that substantial evidence did not support the Workers' Compensation Court's determination that the State Fund's termination of benefits was reasonable. Stevens, 886 P.2d at 968.

Stevens has no application here. That case involved an insurer's duty in investigating and evaluating information upon

20

which it ultimately terminated benefits already being paid, and its failure to even review investigative materials it had commissioned. <u>Stevens</u> does not support Marcott's contention that, in evaluating liability and compensability issues, an insurer can rely on neither the claimant's own statements regarding the circumstances surrounding his injury nor reports from his doctors containing the same description of how the injury occurred. It also does not support the theory that an insurer has an affirmative duty to ask the claimant specific follow-up questions to uncover facts additional to, or different from, those provided by the claimant in an effort to establish facts upon which the compensability of the injury might be more clear.

In the final analysis, it remains the claimant's burden to prove the compensability of his injury by a preponderance of the evidence. <u>See</u> Walker v. United Parcel Service (1993), 262 Mont. 450, 454, 865 P.2d 1113, 1116. While we reaffirm our cases imposing an affirmative duty on insurers to reasonably investigate and evaluate a claim, we decline to expand that duty by imposing a requirement that an insurer must attempt to build a case for the claimant by discounting the claimant's own statements to the employer and to his doctors.

We conclude that the record contains substantial evidence to support the Workers' Compensation Court's finding that LP reasonably relied on the information provided by Marcott. We further conclude that the Workers' Compensation Court's implicit finding that LP's investigation was not unreasonable pursuant to

21

Stevens is supported by substantial evidence.

    2. Did the Workers' Compensation Court err as a matter of law in refusing to apply "the Holton rule"?

The Workers' Compensation Court concluded that, even though several of Marcott's physicians noted in their reports that his injury was work-related, these opinions were not conclusive regarding the compensability of the injury. Marcott contends that the court's legal interpretation was incorrect because he is entitled to the statutory penalty pursuant to our decision in Holton as a matter of law. We review the Workers' Compensation Court's conclusions of law to determine whether they are correct. Stordalen, 862 P.2d at 394.

    Marcott relies on the following language from Holton:

> The triggering event for the purpose of awarding penalties for unreasonable delay or refusal to pay compensation is the insurer's receipt of medical verification of a compensable injury. Unless such verification contradicts other evidence sufficient to make the verification inherently incredible, the insurer's duty to pay commences and failure to pay (or deny a claim) will expose the carrier to the possibility of penalties after thirty days.

Holton, 637 P.2d at 13 (citations omitted). Marcott argues that, pursuant to this language, LP's legal duty to pay him workers' compensation benefits began as soon as it received an indication from one of his doctors that his injury was work-related. His position, however, does not take into account either the facts upon which Holton was decided or the totality of our decision in that case.

    In Holton, the claimant was injured at work in late 1972,

22

required--and recuperated from--surgery, and returned to work. He left Stoltze's employ for less strenuous work at better pay, but was laid off soon thereafter. He ranched for a time, following which he managed a bar. He continued to experience pain and stiffness resulting from the work-related injury. Holton, 637 P.2d at 11.

The insurer was notified in early 1974 that the claimant's physician gave him a 5% total body impairment rating. Thereafter, the insurer's physician rendered a 10% impairment rating and the insurer offered to settle on the basis of that rating. The claimant made a counteroffer and heard nothing more from the insurer for more than four years; no benefits were paid during that time. Other issues aside, the Workers' Compensation Court ultimately determined that the claimant suffered a 40% disability, but denied imposition of the statutory penalty. Holton, 637 P.2d at 11-13.

The claimant argued on appeal that, under the facts of his case, he was entitled to the § 39-71-2907, MCA, penalty. We discussed both the statute and case law in stating that "the triggering event" for imposition of the penalty for unreasonable delay or refusal to pay "is the insurer's receipt of medical verification of a compensable injury." Holton, 637 P.2d at 13. On receipt of such medical verification and absent other evidence rending the verification inherently incredible, the insurer's duty to pay begins and failure to pay exposes the insurer to the "possibility of penalties." Holton, 637 P.2d at 13 (citations

23

omitted). Contrary to Marcott's arguments here, these statements did not resolve the penalty issue in Holton; nor did they become a controlling rule of law that receipt of medical verification of a compensable injury, followed by nonpayment of benefits, automatically results in the imposition of the penalty as a matter of law. They merely set the stage for our resolution of the case.

The facts on which our decision in Holton was based were that both the claimant's physician and the insurer's physician had rendered impairment ratings and, after an initial settlement offer was made and rejected, the insurer took no action whatsoever for more than four years. Holton, 637 P.2d at 13. We observed that § 39-71-2907, MCA, does not provide the insurer the right to delay the payment of any compensation until a formal hearing; indeed, the converse is true: the insurer has a duty to promptly pay any undisputed compensation. Holton, 637 P.2d at 13. "[T]he only legitimate excuse for delay of compensation is the existence of genuine doubt, from a medical or legal standpoint, that any liability exists." Holton, 637 P.2d at 14 (citations omitted). Notwithstanding the dispute as to the total compensation due, both parties in Holton agreed as of March 31, 1975, that at least a 10% disability claim should be paid; the insurer made no payments of benefits. On the basis of those undisputed facts, we determined that the insurer had "no legitimate excuse for delay in paying the 10% disability claim prior to the hearing. The penalty for unreasonable delay, as provided by section 39-71-2907, MCA, is justified." Holton, 637 P.2d at 14.

24

It is clear that the facts of Marcott's case are not analogous to those in Holton. Here, a factual dispute existed concerning the events surrounding the injury and, on the basis of the facts as Marcott originally reported them, LP relied on a legal interpretation under which Marcott's claim was not compensable; the Workers' Compensation Court determined that the legal interpretation was not unreasonable. We stated in Holton that the existence of genuine doubt over liability--from either a medical or a legal standpoint--constitutes a legitimate reason to delay or refuse payment of workers' compensation benefits. Holton, 637 P.2d at 14. Indeed, as set forth above, Holton is only one case in a line of cases clarifying that the statutory penalty in § 39-71-2907, MCA, was never intended to preclude an insurer's assertion of a legitimate defense to liability. See, e.g., Hunter, 730 P.2d at 1142; Paulson, 673 P.2d at 1283.

Nothing in Holton requires immediate payment of benefits where disputed legitimate factual or legal issues relating to compensability and liability exist. We hold, therefore, that the Workers' Compensation Court did not err as a matter law in refusing to apply Holton.

Affirmed.

_____
Justice

25

We concur.

_____
Chief Justice

_____

_____

_____
Justices

_____
The Honorable Robert P. Goff,
Judge of the District Court
sitting for Retired Justice
Fred J. Weber

26

Justice Terry N. Trieweiler dissenting.

I dissent from the majority opinion. The employer's conduct in this case was not only unreasonable, it was arrogant and oppressive. Further review of the facts is necessary in order to fully appreciate what little basis LP had for its denial of Marcott's claim.

Bruce Marcott was injured during the course of his employment on February 17, 1994, while working to repair a forklift with Gene Quillen. His injury occurred after he jumped down from the forklift, took two or three brisk steps to the rear of the forklift, and turned sharply to his left to walk around behind the forklift. At the point where he began his turn, he placed his weight on his left foot, and as he pushed off he heard a loud pop that sounded like a gun going off, experienced an extreme pain in his left calf, and nearly fell to the floor. He was able to catch himself, struggled over to another part of the room, and sat down on a chair. In this condition, when questioned by his employer's personnel, he explained that he was walking, felt a pop in his leg, and his leg went out.

Following his injury, Marcott was taken to a Belgrade clinic where he was examined by Dr. Robert Jackson. Dr. Jackson diagnosed an injury to a calf muscle, treated him conservatively, gave him crutches, and told him to return if his condition did not improve. Following that treatment, Dr. Jackson completed an Attending Physician's First Report and Initial Treatment Bill, which was received by the insurer on February 23. On that form, he was asked

27

whether the condition for which he treated Marcott was due to a work-related accident. He answered "yes."

When Marcott's condition did not improve, but instead worsened considerably, he was seen on February 21 by Dr. John Campbell, an orthopedic surgeon. Dr. Campbell admitted him to the hospital the same day, where he treated him surgically for a ruptured gastrocnemius muscle. On February 25, 1994, Dr. Campbell also completed an Attending Physician's First Report and Initial Treatment Bill. In response to the same question regarding the cause of Marcott's injury, he also answered that it was caused by a work-related accident.

Subsequent to Marcott's release from the hospital following Dr. Campbell's surgery, he developed blood clots in his leg and lungs for which he was readmitted to the hospital for further treatment. During that hospitalization, he was treated by Dr. David B. King, a family physician. During the course of that treatment, Dr. King specifically questioned Marcott about the activity he was engaged in at the time of his injury, and received a more specific description of that activity than had been given in response to more general questions which had been asked previously. In a later report regarding that conversation, he related the history given by Marcott, and his conclusions based on that history, as follows:

> Mr. Marcott has indeed given me the history of the event occurring while making a sharp turn at a brisk walking pace. . . . [I]t was during the hospitalization and in the context of reviewing the events of his original injury with an eye towards trying to better understand

28

the sequence of events which followed. I consider it to have been spontaneous, uncoached, and valid testimony.

> . . . .

> To summarize, Bruce suffered what in my experience is a most unusual injury from a relatively benign activity which has led through a series of complications leaving him with the long term problem which I have just described. There is no reason to suspect that there is anything other than a cause and effect sequence at work, initiated by the brisk walking with a sharp turn to the left causing a minor muscle injury which unfortunately led to the compartment syndrome and swelling ultimately leading to the surgery and finally to the blood clot. There is likewise no reason to doubt that this happened at the time and place Bruce suggests. It occurred at work. While it is not specifically caused by any unusual demands placed on him by his employment (we all walk briskly and turn suddenly) it in fact happened at work and led to the above complications as described.

During the course of prolonged treatment for various complications from his original injury, Marcott was seen by five other physicians. All of these physicians submitted bills to the insurer which indicated that Marcott's injury was work related. Altogether, eight physicians examined Marcott and billed the insurer for their services. Not one of them ever suggested that his injury was anything but work related.

In spite of all of this information, at no time from the date of Marcott's injury until the date of trial did either Bill Fleming or John Mikkelson, the defendant's employees who were responsible for denying Marcott's claim, ever contact one of Marcott's physicians to determine why, in their opinion, his injury was work related, or what specific description of activity they were relying on, or whether the doctors had information about his activity other than the general information gathered by witnesses at the scene of

29

the accident when Marcott was more concerned about getting to the hospital than engaging in semantic distinctions about the specific type of activity he was engaged in when he was injured. Never did Fleming or Mikkelson question any doctor who had actually seen or treated Marcott about how this injury could have occurred while walking, or whether something other than normal activity would have been required to cause such an injury.

Instead, on March 21, 1994, Mikkelson simply wrote to Marcott and told him that his injury was not related to employment activities. Subsequent to that date, Dr. Campbell made the following entry in his office notes:

> I think all these problems are related to his initial gastrocnemius rupture which I documented at surgery which happened at work. I feel this is a work related injury, and all these complications are secondary to this work related injury.

That office note was received by Marcott's employer on approximately April 7, 1994.

On April 29, 1994, counsel for Marcott sent a letter to the employer which explained the nature of activity in which Marcott had been engaged at the time of his injury. Along with the letter he sent a notarized statement from the only person working with Marcott who confirmed that Marcott had been walking rapidly and turning sharply. In spite of all of the undisputed medical records and this additional documentation, LP continued to deny Marcott's claim.

Instead of paying one cent to Marcott with which he could pay for his groceries, make his house and car payments, pay his medical

30

bills, and support his family, LP waited until it concluded that it would have to defend against a petition in the Workers' Compensation Court and spent its money hiring an expert consultant to review Marcott's records. Even then it did not bother asking the expert consultant to personally examine Marcott or take a history from him. It did, however, pay that consultant $725 to review the records and issue a report, and another $2500 to appear briefly and testify at the time of Marcott's trial.

In *Stevens v. State Compensation Mutual Insurance Fund* (1994), 268 Mont. 460, 886 P.2d 962, we cited authority for the following obligation on the part of any insurer or employer:

> Our case law provides that "an insurer has a duty to make at least a minimal investigation of a claim's validity in light of the relevant statutes. Absent such investigation, denial of a claim for benefits is unreasonable." *Lovell [v. State Comp. Mut. Ins. Fund* (1993), 260 Mont. 279, 288], 860 P.2d [95] at 101. See also; *Gaumer v. Montana Dept. of Highways* (1990), 243 Mont. 414, 421, 795 P.2d 77, 81.

*Stevens*, 268 Mont. at 466-67, 886 P.2d at 966.

In this case, if the employer was not going to simply grant Marcott's claim for workers' compensation benefits based on the uncontroverted medical documentation that had been provided, then it had a clear obligation to further investigate by questioning at least one of his health care providers before denying the claim. Although the conclusion is so obvious it should not require authority, we have clearly so held in the past. In *Holton v. F.H. Stoltze Land and Lumber Co.* (1981), 195 Mont. 263, 637 P.2d 10, we made the following statement about the triggering event for a finding that an insurer has acted unreasonably:

31

The triggering event for the purpose of awarding penalties for unreasonable delay or refusal to pay compensation is the insurer's receipt of medical verification of a compensable injury. Unless such verification contradicts other evidence sufficient to make the verification inherently incredible, the insurer's duty to pay commences and failure to pay (or deny a claim) will expose the carrier to the possibility of penalties after thirty days.

*Holton*, 195 Mont. at 268, 637 P.2d at 13.

In spite of the obvious obligation to investigate, and LP's obvious failure to do so in any meaningful way, LP was allowed to justify its conduct based on its adjuster's opinion that some doctors believe any accident occurring at work is automatically work related. Although there was no foundation for such testimony, even if it had been true it would have been totally irrelevant to this case since not one doctor who had seen the claimant and expressed the opinion that his injury was work related was asked by that same adjuster what the basis for his or her opinion was. If that testimony was not irrelevant enough, the Workers' Compensation Judge made a total farce of matters by going on to conclude that "[b]ased on its own review of many, many medical depositions, the Court can validate the adjuster's observation." The trial judge's finding gives new and dangerous meaning to the notion of "judicial notice."

In summary, based on all of the evidence in this case, LP's conduct was unreasonable for two reasons. First, if the real issue was whether Marcott was simply walking or was walking briskly and turning sharply at the time of his injury, then the employer conducted absolutely no investigation from which it could make that

32

determination. It simply took great satisfaction in and then relied on an inadequate description of events based on an inadequate interrogation of the claimant at the scene of the accident while he was experiencing excruciating pain and concerned about nothing other than getting to the hospital or to a doctor.

Second, whether claimant was merely walking or was walking briskly and turning sharply makes absolutely no difference to the question of whether his injury was caused by a work-related accident. Section 39-71-119(2), MCA, defines an accident as an "unusual strain." We have repeatedly held that when used in the Workers' Compensation Act, "unusual strain" refers to either cause or effect. Even assuming that LP's arbitrary and unqualified medical opinions, which they arrived at without the benefit of medical consultation, were correct, Marcott's ruptured gastrocnemius muscle would have been an unusual result from walking, whether the walking was normal or brisk.

The cases relied upon by LP to justify its denial of Marcott's claim are simply not on point. In neither *Ness v. Diamond Asphalt Co.* (1964), 143 Mont. 560, 393 P.2d 43, nor *Dumont v. Wickens Brothers Construction Co.* (1979), 183 Mont. 190, 598 P.2d 1099, was there any evidence that the employees' heart attacks were caused by work-related activity. In this case, there was no question about the fact that Marcott's injury was caused by a work-related activity (walking). Marcott was attempting to fix his employer's forklift. In an effort to do that, he hopped off the forklift, walked to the back of the forklift, and was attempting to go behind

33

it. The only reason for this activity was to serve his employer. Therefore, his activity was clearly "work related." The only dispute was whether at the time of his injury he was walking normally or briskly. However, as pointed out by the majority, pursuant to our decision in *Robins v. Ogle* (1971), 157 Mont. 328, 485 P.2d 692, that distinction is irrelevant.

*Ness* was decided before the language "unusual strain" was even included in the definition of injury or accident. In *Dumont*, the employee died in bed and the only contention by his survivor was that the activity which caused his death constituted an "unusual strain." There was simply no contention that the effect of his activity was an "unusual strain." *Dumont*, 183 Mont. at 192, 598 P.2d at 1101. Furthermore, there was no witness to testify that he even complained of an unusual problem in reaction to the activities he had engaged in. Finally, in *Wise v. Perkins* (1983), 202 Mont. 157, 656 P.2d 816, the issue again was concerned with whether the cause of that claimant's injury was an "unusual strain," not whether she could receive compensation had the effect of her activity been an unusual strain.

In *Robins*, we held that an unusual result from normal activity qualifies as an "unusual strain." *Robins*, 157 Mont. at 333, 485 P.2d at 695. In *Holton*, we held that when an insurer or employer denies or unreasonably delays payment of benefits which are justified by uncontroverted medical documentation, it has acted unreasonably. *Holton*, 195 Mont. at 268, 637 P.2d at 13. In *Stevens*, we held that,

34

absent a reasonable investigation, denial of a claim for benefits is unreasonable. *Stevens*, 268 Mont. at 467, 886 P.2d at 966. In this case, LP ignored all three cases and avoided any consequence. The entire burden of its unreasonable conduct must now be born by the unemployed claimant.

The majority's disregard for the evidence in this case causes an extreme injustice and hardship for Marcott. He has not only lost a $40,000 per year job due to a work-related injury with no prospects for reemployment in the near future and been forced to live on and provide for his family with disability benefits that represent a fraction of his former income, he is somehow supposed to figure out how to pay thousands of dollars for attorney fees for services that never should have been required to recover disability benefits to which he was so clearly entitled. The reluctance of the Workers' Compensation Court and this Court to pass the cost of unnecessary litigation to the responsible insurer is especially disturbing because it comes at a time when the laws have been changed to prevent injured workers from hiring the attorneys who have, in the past, been essential to the enforcement of their rights. *See* §§ 39-71-611 and -612, MCA (1987).

For these reasons I dissent from the majority opinion.

_____
Justice

Justice William E. Hunt, Sr., joins in the foregoing dissenting opinion.

_____
Justice

35

Justice W. William Leaphart, dissenting.

I dissent from the majority opinion. LP failed to make the "minimal investigation of a claim's validity" as required by our holding in Lovell v. State Compensation Mutual Ins. Fund (1993), 260 Mont. 279, 288, 860 P.2d 95, 101. Under Lovell, denial of Marcott's claim without making such a minimal investigation was unreasonable.

_____
Justice

36